IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Chief Judge Edward W. Nottingham**

Civil Action No. 06-cv-02162-EWN-BNB

NOBLE SCOTT KELLY,

    Plaintiff,

v.

UNITED PARCEL SERVICE, INC., an Ohio corporation,

    Defendant.

---

**ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

---

This matter is before the Court on Defendant's Motion for Summary Judgment [Dkt. # 48], filed on November 30, 2007 and accompanied by a supporting brief and attached exhibits ("Def.'s Brief") [Dkt. # 49]. Plaintiff filed a response to the motion on January 11, 2008 ("Pl.'s Resp.") [Dkt. # 57], and defendant filed a reply on February 12, 2008 ("Def.'s Reply") [Dkt. # 64]. The Court finds that oral argument on defendant's motion will not materially assist the Court, and the motion is now ripe for disposition.

**I.    BACKGROUND**

In this employment discrimination matter, Plaintiff Noble Scott Kelly alleges that United Parcel Service, Inc. ("UPS"), his employer, discriminated and retaliated against him on the basis of his race and created a racially hostile work environment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* The following facts are either undisputed or viewed in the light most favorable to plaintiff, the non-movant.

**General Employment Background**

UPS hired Kelly in 1983 as a part-time unloader at its Commerce City Hub. (Pl.'s Depo. I, Ex. 1 to Def.'s Brief, at 5.) In 1988, Kelly transferred from the unloader position to the irregular sort area, handling irregular and oversized packages. (*Id.* at 37.) Throughout his employment, Kelly has been a union employee subject to the terms of a Collective Bargaining Agreement ("CBA") between UPS and the International Brotherhood of Teamsters (the "Union"). (*Id.* at 104.)

The CBA contains a grievance procedure that may be utilized by union employees to contest disciplinary action by UPS. (Aff. of John Cooper, UPS Employee Relations Manager, Ex. 27 to Def.'s Brief, ¶ 3.) When an employee files a grievance, UPS and the Union hold an informal "local hearing" to exchange facts and attempt to resolve the grievance by agreement. (*Id.* ¶ 4.) If the grievance is not resolved at this level, it is referred for a hearing to a state panel consisting of three Union officials and three UPS officials. (*Id.* ¶ 5.) A decision may be reached by a majority vote of the panel, and the decision can be challenged by either party. (*Id.*) If the grievance is not resolved, it is forwarded to a second-level panel called the Joint Area Committee ("JAC"), also made up of Union and UPS representatives, which conducts a hearing and renders a decision by majority vote that is binding on the parties. (*Id.* ¶ 6.)

**Alleged Instances of Racial Harassment**

Kelly, who is African American, alleges that he was subjected to numerous racial comments by his supervisors and co-workers during the course of his employment. Specifically, he complains of the following comments:

2

- In 1984 or 1985, an unnamed employee called Kelly a "dirty black man" and a "nigger." (Pl.'s Depo. I at 41–42; Pl.'s Depo. III, Ex. 3 to Def.'s Brief, at 40–41.)

- In 1997 or 1999, Kelly overheard co-worker Dean Brown discussing a restaurant called Sambo's and stating that he thought the word Sambo "refers to blacks." (Pl.'s Depo. I at 56; Pl.'s Depo. III at 39–40.) Kelly informed Brown the comment was offensive, but did not report him to UPS management. (Pl.'s Depo. I at 57–58.)

- In 2000, Brown told Kelly a joke referring to a police helicopter as a "ghetto bird," and Kelly complained to UPS and the Union. (*Id.* at 52–53; Pl.'s Depo. III at 41–42.) UPS investigated the incident, a manager told Brown the comment was offensive and inappropriate, and Brown apologized and did not make a similar comment again. (Pl.'s Depo. I at 53–55.)

- In late 2002 or early 2003, supervisor Jim Caveleri said to Kelly something to the effect of, "that's a good waste of a black boy." (*Id.* at 42–44; Pl.'s Depo. III at 38–39.) Kelly heard Caveleri say the same thing to another African American employee in 2004. (Pl.'s Depo. I at 44–45.) Both times, Kelly informed Caveleri he thought the comment was offensive, but he did not file a complaint with UPS about Caveleri. (*Id.* at 44, 46, 50.)

- In 2004, Kelly heard that Caveleri had told another African American employee to "move your feet like Kunta Kinte and run." (*Id.* at 46; Pl.'s Depo. III at 39.) Kelly did not actually hear Caveleri make the comment. (Pl.'s Depo. I at 47.)

- In 2004, a supervisor named Chris said, "Thank you, boys" to Kelly and another African American employee after they made room for him to pass by in a golf cart. (*Id.* at 59–60.) Kelly interpreted the term "boys" as being racially derogatory because, when he told Chris it was offensive and offered to shake his hand, Chris did not respond and kept his hands in his pockets. (*Id.* at 62–63.) Kelly did not report the incident. (*Id.* at 63–64.)

**<u>Disciplinary Actions against Kelly and Complaints of Discrimination</u>**

In September 2000, Kelly was terminated following a confrontation with a supervisor. (*See* Pl.'s Depo. I at 86–87.) He then complained to a UPS manager that he believed he was being subjected to racial discrimination. (*Id.* at 88.) The manager investigated the incident, and Kelly was reinstated. (*Id.*) As discussed in detail below, from the time of his reinstatement in September 2000 to the date he filed the underlying EEOC charge in January 2005, Kelly was

3

terminated six more times for various disciplinary infractions, and each time he utilized the grievance process and was reinstated with a lesser sanction.

On April 5, 2001, Kelly was terminated for taking an unauthorized break and stealing company time. (Exs. 8 & 9 to Def.'s Brief.) The parties agreed to resolve the dispute at the local hearing level, and the termination was reduced to a 10-day unpaid suspension. (Ex. 10 to Def.'s Brief; Pl.'s Depo. III at 70.) In December 2001, Kelly was terminated for insubordination and stealing company time for failing to punch out as directed by a supervisor. (Pl.'s Depo. I at 192–94.) The state panel reduced the termination to a 10-day unpaid suspension, which neither party challenged. (*Id.* at 194; Pl.'s Depo. II, Ex. 2 to Def.'s Brief, at 164–65.)

On April 18, 2002, Kelly filed a charge of discrimination with the EEOC (the "First Charge"), complaining that he had been subjected to discriminatory discipline for talking at work and was being constantly watched by a supervisor. (Ex. 25 to Def.'s Brief.) The EEOC issued Kelly a Dismissal and Notice of Rights on July 3, 2002. (Ex. 26 to Def.'s Brief.) Kelly never filed a lawsuit based on the allegations in the First Charge.

On July 18, 2002, Kelly was terminated for falsifying his time card and stealing company time. (Pl.'s Depo. II at 123–24; Ex. 14 to Def.'s Brief.) The state panel reduced the termination to a six-week unpaid suspension and a "final warning." (Ex. 16 to Def.'s Brief.) Neither party challenged the decision.

On December 29, 2003, Kelly called the UPS hotline and submitted a complaint that he believed he was being harassed and discriminated against.[1] (Ex. 1 to Pl.'s Resp.) In the report, he claimed that he was being excessively monitored in the performance of his job duties, that supervisor Joe Rosenberger required him, but not other employees, to complete paperwork in his own area and to refrain from speaking with others while working, and that Rosenberger acted in a belligerent manner toward Kelly when he requested optional holiday leave. (*Id.*) Hub manager Joe Gonzalez and another manager investigated the complaint and concluded there was no proof of discrimination, but did review UPS's anti-harassment policy with Rosenberger and instructed him "to treat others with respect." (*Id.*)

On February 20, 2004, Kelly was terminated after an incident in which he drove more slowly than directed by a supervisor due to safety concerns. (Pl.'s Depo. I at 153.) UPS informed Kelly he had been terminated for refusing to work as directed and insubordination towards management. (*Id.* at 155; Ex. 2 to Pl.'s Resp.) The dispute went up to the JAC, which reduced Kelly's termination to an 84-day unpaid suspension. (Pl.'s Depo. I at 159.)

Finally, Kelly was terminated on October 9, 2004 for insubordination, creating a work slowdown, creating a hostile work environment, and refusing to work as directed. (Ex. 19 to Def.'s Brief.) Kelly's grievance was resolved by agreement at the local level, and his termination was reduced to a 10-day suspension. (Ex. 20 to Def.'s Brief; Pl.'s Depo. I at 128–30.)

---

[1] UPS argues the Court should not consider this complaint because it was mentioned for the first time in Kelly's response to UPS's motion for summary judgment. The Court need not address this argument because consideration of the December 2003 complaint does not affect the disposition of the motion.

5

Kelly filed a second Charge of Discrimination with the EEOC on January 27, 2005 (the "Second Charge") and received a right to sue letter on July 31, 2006. He filed the underlying action on October 27, 2006, asserting three claims for relief: (1) racial discrimination in violation of Title VII; (2) racial harassment in violation of Title VII; and (3) retaliation in violation of Title VII. UPS moves for summary judgment on all claims.

## II. STANDARD OF REVIEW

Summary judgment is appropriate under Fed. R. Civ. P. 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). When applying this standard, a court reviews the pleadings and the documentary evidence in the light most favorable to the nonmoving party. *See Gray v. Phillips Petroleum Co.*, 858 F.2d 610, 613 (10th Cir. 1988). To defeat a properly supported motion for summary judgment, "there must be evidence on which the jury could reasonably find for the" nonmoving party. *Panis v. Mission Hills Bank, N.A.*, 60 F.3d 1486, 1490 (10th Cir. 1995), *cert. denied*, 516 U.S. 1160 (1996) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). In addition, "'where the non-moving party will bear the burden of proof at trial on a dispositive issue' that party must 'go beyond the pleadings' and 'designate specific facts' so as to 'make a showing sufficient to establish the existence of an element essential to that party's case' in order to survive summary judgment." *McKnight v. Kimberly Clark Corp.*, 149 F.3d 1125, 1128 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 322).

## III.     ANALYSIS

### A.     Racial Harassment/Hostile Work Environment Claim

Under Title VII, an employer may not discriminate against an individual with respect to the compensation, terms, conditions, or privileges of his employment because of the individual's race. 42 U.S.C. § 2000e-2(a)(1). It is well-established that "a victim of a racially hostile or abusive work environment may bring a cause of action" under Title VII if the conduct complained of is "'sufficiently severe or pervasive to alter the conditions of . . . employment and create an abusive working environment.'" *Bolden v. PRC Inc.*, 43 F.3d 545, 550–51 (10th Cir. 1994) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (internal quotation marks omitted)).

Kelly alleges in his second claim for relief that UPS supervisors and employees "racially harassed Mr. Kelly through offensive comments and behavior as well as by denying him the professional respect and opportunities granted to Caucasian employees." (Compl. [Dkt. # 1] ¶ 67.) He also alleges that he reported such harassment to UPS management, but no action was taken. (*Id.* ¶ 65.) UPS argues, and the Court agrees, that Kelly failed to exhaust his administrative remedies as to his hostile work environment claim and that the Court therefore lacks jurisdiction over this claim.

Courts generally do not have jurisdiction over Title VII claims that were not part of a timely filed EEOC charge. *Annett v. Univ. of Kan.*, 371 F.3d 1233, 1238 (10th Cir. 2004) (citation omitted). "'When an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or

7

reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC.'" *Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003) (quoting *Ingels v. Thiokol Corp.*, 42 F.3d 616, 625 (10th Cir. 1994)). A claim is "reasonably related" to the EEOC charge allegations "when 'the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made.'" *Mitchell v. City & County of Denver*, 112 Fed. Appx. 662, 667 (10th Cir. 2004) (unpublished opinion) (quoting with alteration *Deravin v. Kerik*, 335 F.3d 195, 200–01 (2d Cir. 2003)).

Kelly's Second Charge, filed with the EEOC on January 27, 2005, is the operative charge for this litigation. In the Second Charge, Kelly checked the boxes indicating discrimination based on race, color, retaliation, and age. (Ex. 21 to Def.'s Brief.) He stated the earliest date the discrimination took place was February 20, 2004 and the latest date was October 9, 2004; he did not check the box marked "continuing action." (*Id.*) In the section providing for a description of "the particulars," Kelly stated:

> I. On/about February 20, 2004, I was discharged from my Irreg Operator position. In/about May 2004, I [was] reinstated. On/about October 9, 2004, I was discharged again. I was reinstated within seven to eight days thereafter. I have been wrongfully discharged six times over the past four years and retaliated against for filing internal complaints/grievances about discrimination.
>
> II. On/about February 20, 2004, I was told that my discharge was based on eleven seconds of non-productive activity at work. On/about October 9, 2004, I was told that I had acted disrespectfully towards a supervisor.
>
> III. I believe that I have been discriminated against based on my race, Black, my color, my age, 56, and in retaliation, in violation of Title VII of the Civil Rights

>Act of 1964, as amended, and in violation of the Age Discrimination in Employment Act (ADEA) of 1967, as amended, in that:
>
>a. I am a satisfactory performer.
>
>b. I have been discharged six times over the past four years. Most recently, I was discharged in February 2004 and again in October 2004. Although I have been reinstated, I am being targeted for continual discharges because of my race, color, age, and retaliation.

(*Id.*)

Kelly argues that the Second Charge, "although not precise, contains sufficient factual information to provide notice of a racially hostile work environment which would lead the EEOC to investigate a charge of racial harassment." (Pl.'s Resp. at 16.) An actionable claim for a racially hostile work environment requires a showing that under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus. *Bolden*, 43 F.3d at 551. "[S]poradic racial slurs" are insufficient; rather, "there must be a steady barrage of opprobrious racial comments." *Id.* (citations omitted).

In this case, even reading the Second Charge liberally, the Court holds that an EEOC investigation into Kelly's claims that he was subjected to racial slurs and comments during the course of his employment could not "reasonably be expected to grow out of" the allegations contained in the charge. Indeed, there is no mention in the Second Charge of *any* racially offensive comments or behavior, let alone a "steady barrage" of such comments. Rather, Kelly complains in the Second Charge that he was terminated from his employment on multiple, discrete occasions for unlawful discriminatory and retaliatory reasons. Thus, as in *Mitchell*, "[t]his is not a

case where [plaintiff] simply neglected to attach a legal label to his underlying factual allegations." 112 Fed. Appx. at 667–68. Rather, the Second Charge contains no factual allegations that are reasonably related to a hostile work environment claim, and the claim is therefore dismissed for failure to exhaust administrative remedies.

Moreover, even if the Second Charge had been sufficient to preserve a hostile work environment claim, the claim would fail on its merits. Kelly presented evidence that he either was subjected to or heard five overtly racially offensive comments and one arguably racial comment (the use of the term "boys") over approximately 18 years at UPS. *See supra* § I. Of those comments, Kelly apparently only complained to UPS management about the "ghetto bird" joke made by co-worker Dean Brown. (Pl.'s Depo. I at 52–53; Pl.'s Depo. III at 41–42.) According to Kelly, UPS investigated the incident, a manager told Brown the comment was offensive and inappropriate, and Brown apologized and did not make a similar comment again. (Pl.'s Depo. I at 53–55.) As a matter of law, these isolated comments over an 18-year period do not amount to "a steady barrage of opprobrious racial comments" that was "pervasive or severe enough to alter the terms, conditions, or privileges" of Kelly's employment. *Bolden*, 43 F.3d at 551 (citations omitted).

### B.  Discrimination Claim

Kelly's first claim for relief is for racial discrimination in violation of Title VII. UPS argues that the factual allegations underlying this claim and Kelly's claim for racial harassment, discussed in § III(A), *supra*, are the same, and that the discrimination claim should thus be

dismissed for the same reasons as the harassment claim—failure to exhaust administrative remedies and failure to establish a hostile work environment. The Court agrees.

First, the factual allegations in the complaint underlying both claims are worded almost identically and are based on Kelly's being subjected to offensive comments and behavior and generally being denied professional respect and opportunities because of his race. (Compl. ¶¶ 58, 60, 67–68.) The discrimination claim also alleges Kelly was "referred to in a demeaning manner" and "subjected to racial slurs." (*Id.* ¶ 59.) Under neither claim does Kelly allege he was terminated on the basis of his race.

In addition to the similarity of the factual allegations underlying the claims in the complaint, Kelly argues in his response to UPS's summary judgment motion that he should be permitted to proceed on both the discrimination claim and the harassment claim "because several racist comments were made in 2004." (Pl.'s Resp. at 9.) Further, in arguing there is evidence to support both causes of action, Kelly utilizes the framework for establishing hostile work environment claims, stating: "To establish a claim for race discrimination, the Plaintiff 'must present evidence that 1) the harassment was pervasive or severe enough [to] alter the terms, conditions, or privileges of employment; and 2) the harassment was racial or stemmed from racial animus.'" (*Id.* at 10) (citing cases). The remainder of Kelly's argument focuses on the specifics of the comments and behavior directed at Kelly and whether they were sufficiently severe and pervasive to be actionable under Title VII. (*See id.* at 10–14.)

This review of the complaint and Kelly's summary judgment briefing demonstrates that Kelly's first and second claims for relief, and his arguments in support thereof, are both in

substance claims that Kelly was discriminated against in violation of Title VII based on his being the victim of a hostile work environment. Again, there are no allegations or argument that any of Kelly's terminations, which constitute discrete adverse employment actions, were unlawfully based on his race. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002) (distinguishing between discrimination claims stemming from discrete acts such as termination or failure to promote and discrimination claims stemming from a hostile work environment, which are "based on the cumulative effect of individual acts"). Rather, the allegations underlying both claims are that "a series of separate acts" occurred, *i.e.*, the racially offensive comments and behavior, that "collectively constitute one 'unlawful employment practice.'" *Id.* at 117 (citation omitted). In contrast, Kelly's terminations are discussed extensively in connection with his retaliation claim. (Compl. ¶¶ 73–75; Pl.'s Resp. at 17–27.)

In sum, while brought as a separate cause of action, Kelly's first claim for relief for discrimination, like his second claim for relief, states a claim for hostile work environment. As discussed above, such a claim fails on exhaustion grounds as well as on its merits. Accordingly, Kelly's first claim for relief is dismissed.

### C. Retaliation Claim

Title VII bars employers from discriminating against an employee "because he has opposed any practice made an unlawful employment practice . . . or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). Title VII protects employees who engage in

informal as well as formal opposition to unlawful conduct. *See Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 386 (10th Cir. 1984).

In his third claim for relief, Kelly alleges that, after complaining about racial discrimination in September 2000, he was terminated six times over the next four years in retaliation for his complaints. Under Title VII, however, Kelly may only maintain claims for discriminatory actions that occurred within 300 days of his filing a charge with the EEOC on January 27, 2005. 42 U.S.C. § 2000e-5(e)(1). The only discrete, discriminatory act for which Kelly timely filed an EEOC charge, and which accordingly is not time-barred, was his termination on October 9, 2004. *Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act."). However, Kelly may use prior, time-barred acts "as background evidence in support of a timely claim." *Id.*; *Martinez*, 347 F.3d at 1211.

The burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), applies to Title VII retaliation claims. *McGarry v. Board of County Comm'rs of County of Pitkin*, 175 F.3d 1193, 1201 (10th Cir. 1999). A plaintiff must initially satisfy the requirements for a *prima facie* case of Title VII retaliation by showing that (1) he engaged in protected opposition to discrimination, (2) there was an adverse employment action, and (3) there is a causal link between the protected opposition and the adverse action. *Id.* If the plaintiff satisfies his *prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse action. *Argo v. Blue Cross & Blue Shield of Kan.*, 452

F.3d 1193, 1202 (10th Cir. 2006). If the defendant meets that burden, it shifts back to the plaintiff to prove the proffered explanation is a pretext for retaliation. *Id.* at 1203.

Assuming without deciding that Kelly has made out a *prima facie* case for retaliation, the Court holds that UPS has articulated a legitimate, nondiscriminatory reason for Kelly's termination on October 9, 2004, and that Kelly has failed to present evidence that the proffered explanation is pretextual.

According to UPS, Kelly was terminated on October 9, 2004 for insubordination, creating a work slowdown, creating a hostile work environment, and refusing to work as directed, which on their face constitute non-retaliatory reasons for the termination. (Ex. 19 to Def.'s Brief at 2); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147 (2000) (burden to articulate legitimate reason for termination "is one of production, not persuasion," that "can involve no credibility assessment") (quotation omitted). The disciplinary action form that accompanied the termination provided:

> Employee created a hostile working environment by failing to treat a supervisor with respect when asked a question. Employee compounded the hostility by refusing to stop and talk with his [union] steward and supervisor when instructed to do so. Employee failed to work as directed when his supervisor (in front of his steward – Watson) requested he return from his seat on the tug. Employee drove off and stated he was filing a harassment grievance. Employee was causing a work slow down again which initiated all of the contact this evening.

(Ex. 19 to Def.'s Brief at 1.)

Because UPS has articulated a facially non-retaliatory reason for terminating Kelly, the burden shifts back to him to present evidence that UPS's proffered reasons for his termination were pretextual, *i.e.*, unworthy of belief, or to otherwise introduce evidence of illegal

14

discriminatory motive. *Beaird v. Seagate Tech.*, 145 F.3d 1159, 1165 (10th Cir. 1998) (citations omitted). To establish that an employer's proffered reasons are pretextual, an employee must produce evidence of "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997). However, "[m]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.*, 853 F.2d 768, 772 (10th Cir. 1988).

Kelly first argues there is evidence that UPS's stated reasons for firing him in *February* 2004 were pretextual because UPS gave him inconsistent explanations for that termination and because it occurred shortly after he complained of discrimination via the UPS hotline in December 2003. However, even assuming there is evidence of pretext surrounding his February 2004 termination, such evidence does not automatically cast doubt on the proffered explanation for Kelly's termination eight months later in October 2004. Again, the October 2004 termination is the only actionable conduct that may form the basis of his retaliation claim, and without more the circumstances of Kelly's February 2004 termination do not render the stated reasons for his October 2004 termination implausible, inconsistent, incoherent, or contradictory.

Kelly also appears to argue the fact that he was reinstated after each of his terminations shows that the reasons given for all of them were frivolous and provides circumstantial evidence of a retaliatory motive. However, this ignores the fact that Kelly was never reinstated without a

penalty and, even after utilizing the grievance process, has lost over 100 days of paid time over the years. It is also notable that, although Kelly submitted grievances contending that he was wrongfully terminated each time, with the exception of the first termination in September 2000 there is no evidence that he subsequently complained during the grievance process that the terminations were for racially discriminatory or retaliatory reasons. Thus, the mere fact of Kelly's prior terminations and reinstatements, which again are not actionable in this case, simply do not amount to evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" in the specific reasons proffered for his termination in October 2004.

Kelly next appears to argue that UPS's explanation for firing him in October 2004 was false, rendering it unworthy of credence and therefore pretextual. *See Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178 (10th Cir. 2006) (citing *Reeves*, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."), and *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000) ("A plaintiff typically makes a showing of pretext . . . with evidence that the defendant's stated reason for the adverse employment action was false . . . .")). However, to demonstrate pretext in this manner Kelly must show that the UPS decision-makers "did not honestly believe the reasons stated" for his termination. *Id.* at 1179; *see also Kendrick*, 220 F.3d at 1231 (holding that "a challenge of pretext requires us to look at the facts as they appear to the person making the decision to terminate plaintiff").

Kelly's version of the relevant events clearly differs from the description of the incident given in the disciplinary action form. (*See generally* Pl.'s Depo. at 115–29.) However, there is no evidence that Cindy Case, the manager who made the decision to fire Kelly, did not honestly believe the reasons stated on the form. Chester Burney, Kelly's immediate supervisor on the night of the incident, prepared a statement for Case summarizing the incident as follows: Burney asked Kelly why he was beginning the first run of his shift 20 minutes after the shift started, Kelly refused to discuss the matter without a union steward present, and even after Kelly's requested union steward arrived, Kelly twice refused to answer Burney's question, threatened to file a grievance for harassment, and then drove away on his tug. (Ex. 19 to Def.'s Brief at 3.) Roger Trujillo, another supervisor, submitted a statement to Case that, the day before the incident, he had observed Kelly take 25 minutes to begin his first run after clocking in for his shift and explained to Kelly that he was taking too much time. (*Id.* at 4.)

It was not unreasonable for Case to believe Burney's version of the incident, which supports the reasons given for Kelly's termination. Kelly testified he believed the managers were "out to get him" when he was fired, but conceded he had no evidence to support that assertion. (Pl.'s Depo. I at 120–21.) Thus, viewing the facts from Case's perspective, there is no evidence that the reasons provided for Kelly's termination were false.

Because there is no evidence beyond Kelly's "mere conjecture" that UPS's legitimate, non-retaliatory reasons for terminating Kelly in October 2004 were a pretext for discrimination, *Branson*, 853 F.2d at 772, Kelly's retaliation claim fails as a matter of law.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment [Dkt. # 48] is GRANTED, and plaintiff's claims are DISMISSED with prejudice. In light of this order, the hearing on defendant's motion for summary judgment set for April 11, 2008 is VACATED. Defendant may have its costs by filing a bill of costs within eleven days of the date of this order.

DATED: April 10, 2008

BY THE COURT:

s/ Edward W. Nottingham
Edward W. Nottingham
Chief United States District Judge